IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  vs.<br><br>STEVEN CHASE,<br><br>    Defendant. | DOCKET NO. 5:15 CR 15-1 |

**MOTION TO DISMISS FOR OUTRAGEOUS GOVERNMENT CONDUCT**

  Steven Chase, by and through his counsel of record, Assistant Federal Defender Peter Adolf, hereby moves, pursuant to this Court's supervisory power, for dismissal of the indictment due to outrageous government conduct. As grounds therefor, it is averred:

  1. Mr. Chase is accused of running a website named "Playpen" on which child pornography was posted and exchanged among users of the site. Count one of the indictment charges him with participation in a "child exploitation enterprise" in violation of 18 U.S.C. § 2252A(g), a charge carrying a mandatory minimum sentence of 20 years in prison and a maximum of life in prison. Other charges in the indictment include counts of advertising, distributing, and possessing child pornography, with respective statutory ranges of imprisonment of 15 to 30 years, 5 to 20 years, and 0 to 20 years.

  2. Over 100 alleged users of the Playpen website are being prosecuted in federal court in numerous districts throughout the United States for child pornography offenses relating to their alleged downloading of child pornography from the site. This motion relies upon and incorporates information obtained from those cases.

3. Following the arrest of Mr. Chase on February 19, 2015, rather than shutting down the Playpen website, the FBI took direct and exclusive control of the site, moving the data from the commercial servers on which it had been operating to FBI-controlled servers. From there the FBI distributed child pornography to viewers and downloaders worldwide for nearly two weeks, until at least March 4, 2015, even working to improve the performance of the website beyond its original capability. As a result, the number of visitors to Playpen while it was under Government control from an average of 11,000 weekly visitors to approximately 50,000 per week. During those two weeks, the website's membership grew by over 30%, the number of unique weekly visitors to the site more than quadrupled, and approximately 200 videos, 9,000 images, and 13,000 links to child pornography were posted to the site.

4. The government has stood behind its decision to run the website, arguing that doing so was the only way to deploy a piece of software needed for identifying the IP addresses of the site's users. This argument elides the ugly truth that, as one law professor has commented, the "F.B.I. appears to have committed a more serious crime – the distribution of child pornography – to catch people committing less serious crimes: the receipt and possession of child pornography." Carissa Bryne Hessick, "Law Enforcement Alone Shouldn't Decide When to use a Pornography Website to Snare Predators," *New York Times Room for Debate* (Jan. 27, 2016) (available at http://www.nytimes.com/ roomfordebate/ 2016/ 01/27/the-ethics-of-a-child-pornography-sting/lawenforcement- alone-shouldnt-decide-when-to-use-a-pornography-website-to-snare-predators). Moreover, the FBI had obviously been planning the operation for years, having attempted

to obtain judicial permission to use similar techniques as early as 2013. *See In re Warrant to Search a Target Computer at Premises Unknown,* 958 F. Supp. 2d 753 (S.D. Tex. 2013).

5. This behavior is all the more shocking because the federal government itself – in sentencing memoranda, online mission statements, reports to congress, press releases, and arguments before this very Court and many others – has repeatedly emphasized that victims of child pornography are revictimized each and every time their images are viewed online. Despite these frequent pronouncements, the government here made no attempt during the two weeks it was running the site to reduce the harm to innocent third party victims by limiting the ability for users to view or access the images. Indeed, government agents worked hard to upgrade the website's capability to distribute large amounts of child pornography quickly and efficiently, resulting in more users receiving more child pornography faster than they ever did when the website was running "illegally."

6. Nor could the government – as it has itself admitted time and time again – control the spread of these images once uploaded and available on the internet. The government's actions are "so outrageous as to shock the conscience of the court." *United States v. Osborne,* 935 F.2d 32, 36 (4th Cir. 1991). The only remedy for this outrageous conduct is to dismiss the indictment with prejudice.

7. In September 2014, the government began investigating a child pornography website, variably identified in search warrant affidavits as TARGET WEBSITE or WEBSITE A and now publicly identified as "Playpen." *See In the Matter of the Search of Computers that Access upf45jv3bziuctml .onion,* 1:15-SW- 89, Search and Seizure Warrant & Application at ¶ 28 (E.D. Va. Feb. 20, 2015) (hereinafter "NIT warrant") (attached hereto as exhibit 1). With the help of foreign law enforcement officers, the government eventually

determined that the Playpen website was being hosted on a server in Lenoir, North Carolina. *Id.* at ¶ 28. In January 2015, the government obtained and executed a search warrant in the Western District of North Carolina, seizing the server that hosted the Playpen website. *Id.*

8. After seizing the server, the government considered "removing [Playpen] from existence immediately and permanently." *United States v. Michaud,* No. 15 CR 5351, United States' Response to Order Compelling Discovery (doc. no. 109) at 6 (W.D. Wash. Jan. 8, 2016) (hereinafter "*Michaud* Discovery Response") (attached hereto as exhibit 2). Instead, however, the government placed a copy of the seized server, including the child pornography contained on the Playpen website, onto a government controlled server in Newington, Virginia. NIT warrant at ¶ 28. The government then applied for and received a warrant to run the Playpen website itself for 30 days, explaining that in order to identify Playpen's users, it would need to deploy a "Network Investigative Technique" ("NIT"), a piece of computer code designed to work around the fact that the use of Tor had obfuscated the IP addresses of the users on the site. *Id.* at ¶ 31.

9. In its supporting affidavit for the warrant, the government underestimated – and perhaps underreported – the exponential growth in Playpen's members. Particularly troublingly, the government, averaging over "historical data" reaching back to the website's inception, stated Playpen had an average of 11,000 unique weekly visitors before February 20, 2015. *Id.* at ¶ 19. After the warrant issued on February 20, 2015, however, an average of approximately 50,000 unique users visited Playpen each week – more than quadruple the amount suggested by the government's figures. *See Michaud* Discovery Response at 4

("Between February 20 and March 4, 2015, approximately 100,000 unique user accounts logged in to Website A.").

10. Regardless of whether the government either mispresented to the EDVA magistrate judge, or recklessly failed to appreciate the amount of harm caused by running the Playpen website, the government soon acknowledged its operation of Playpen had spiraled out of control. Although the government had been permitted to operate the site for 30 days by Magistrate Judge Buchanan, it ultimately shut down the operation after less than two weeks. *See* NIT warrant Attachment A. The government explained in *Michaud* that it shut the site down early due to the harm it was causing:

> During the government's operation of [Playpen], regular meetings were held to . . . assess whether the site should continue to operate, based upon a balancing of various factors, to include site users' continued access to child pornography, the risk of imminent harm to a child, the need to identify and apprehend perpetrators of those harms to children, and other factors such as those described above. On March 4, 2015, it was determined that the balance of those factors weighed in favor of shutting down the website.

*Michaud* Discovery Response at 7.

11. Especially harmful was the government's distribution of large amounts of child pornography. According to the government, the 100,000 users who visited Playpen during the two weeks it was under government control "posted approximately 13,000 links… either to encrypted archives containing multiple images or video files of child pornography, or to particular image files depicting child pornography." *Michaud* Discovery Response at 3. These same users clicked at least 67,000 unique links to child pornography images, videos, and encrypted archives, and posted thousands of new child pornography images and videos to the website. *Id.*

12. In particular, the government told the District Court in the *Michaud* case that it "recover[ed] approximately 9,000 images and 200 videos that were made available by [Playpen] users while it operated under FBI administrative control between February 20 and March 4, 2015." *Id.* at 2. The government's use of the word "recover," however, is disingenuous and misleading. The images were not recovered in the sense of being retained or retrieved in the way that guns or drugs can be recovered after a sting operation. Instead, once the images were uploaded to the Playpen website, the government had no control whatsoever over the images, which could be sent to other users or posted to other websites. The Department of Justice ("DOJ") has long emphasized the inability to control the spread of digital child pornography, explaining on its own website that "[o]nce an image is on the Internet, it is irretrievable and can continue to circulate forever." U.S. Dept. of Justice, "Child Pornography," Subject Areas: Child Exploitation and Obscenity Section (CEOS) (emphasis added) (available at http://www.justice.gov/criminal-ceos/child-pornography).

13. By the government's own standard, the children portrayed in these images were harmed each time their images were viewed. The DOJ has repeatedly stated that anyone who views child pornography "revictimizes the children by using those images for sexual gratification." U.S. Dept. of Justice, *The National Strategy for Child Exploitation and Prevention and Interdiction: A Report to Congress* at 9 (Aug. 2010) (available at https://www.justice.gov/psc/docs/natstrategyreport.pdf). The government also routinely emphasizes in its press releases that possessing and circulating pornographic images re-victimizes the children depicted in them. *See, e.g.,* U.S. Attorney's Office, S.D. Ind., Press Release, "Ellettsville Man Charged with Production of Child Pornography" (April 15, 2015)

("[p]roducing and distributing child pornography re-victimizes our children every time it is passed from one person to another") (available at https://www.justice.gov/usao-sdin/pr/ellettsville-man-charged-production-child-pornography).

14. Nonetheless, during the two weeks the government ran Playpen, it made no effort to mitigate harm to the victims of child pornography by limiting access to the child pornography on the site. Instead, "[i]mages, videos and links posted by site users both before the FBI assumed administrative control and afterwards, generally remained available to site users." *Michaud* Discovery Response at 4-5. For example, the government did not – as it could have – allow users to login, thus permitting deployment of the NIT, but restrict users' ability to download images from the website or disable portions of the site that contained child pornography while allowing users to navigate other portions of the site. Instead, the government actively facilitated and participated in the distribution of thousands of child pornography images around the world. *See* Joseph Cox, "FBI's Mass Hack Hit 50 Computers in Austria," *Motherboard* (July 28, 2016) (available at https://motherboard.vice.com/read/fbis-mass-hack-Playpen-operation-pacifier-hit-50-computers-in-austria).

15. Indeed, the FBI worked to improve the website's performance, allowing users to download child pornography faster and more efficiently, a change the users commented on extensively in chats recorded on the servers under government control and attached hereto. *See* Playpen bulletin boards – "Playpen Status" (attached hereto as Exhibit 3) (hereinafter Playpen Status chats).

16. As of January 8, 2016, the government had charged 137 individuals in connection with the Playpen investigation. *Michaud* Discovery Response at 7. That

number is less than 1% of the 158,094 total members that Playpen had on February 3, 2015.  NIT warrant at ¶ 11.  Notably, that percentage is roughly the same percentage of Playpen members the government admitted it could have found IP addresses for without deploying the NIT or keeping Playpen running once it had seized the server hosting the site in 2014.  *Id.* at ¶ 29 n. 7 ("The true IP addresses of a small number of users of the TARGET WEBSITE (that amounted to less than 1% of the TARGET WEBSITE) were captured in the log files stored on the [seized] server").

   17. The Supreme Court has long stated that "[r]egard for the requirements of the Due Process Clause 'inescapably imposes upon this Court an exercise of judgment upon the whole course of the proceedings (resulting in a conviction) in order to ascertain whether they offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses.'" *Rochin v. California,* 342 U.S. 165, 169 (1952) (quoting *Malinski v. People of State of New York,* 324 U.S. 401, 416-17 (1945)).  The Court went on to explain that "[t]hese standards of justice are not authoritatively formulated anywhere as though they were specifics.  Due process of law is a summarized constitutional guarantee of respect for those personal immunities which, as Mr. Justice Cardozo twice wrote for the Court, are 'so rooted in the traditions and conscience of our people as to be ranked as fundamental' or are 'implicit in the concept of ordered liberty.'" *Id.* (citations omitted).  The Court has recognized that there may be situations when "the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Russell,* 411 U.S. 423, 431 (1973).

18.     Outrageous conduct by government agents in the course of investigating crime will lead to dismissal of charges on due process grounds if the conduct is "shocking" or "offensive to traditional notions of fundamental fairness." *United States v. Hasan,* 718 F.3d 338, 343 (4th Cir. 2013). "In order to constitute a due process violation, the government's conduct must be so outrageous as to shock the conscience of the court." *United States v. Osborne,* 935 F.2d 32, 36 (4th Cir. 1991).

19.     While the Supreme Court has never detailed exactly what sort of government conduct violates due process and what does not, there are two scenarios where courts have recognized government action could be so outrageous that a criminal indictment should be dismissed. First, it is outrageous misconduct when "the Government supplies contraband, or becomes intimately involved in its production." *United States v. Thoma,* 726 F.2d 1191, 1199 (7th Cir. 1984); *see also United States v. Bogart,* 783 F.2d 1428, 1436 (9th Cir. 1986) (outrageous conduct when government "manufactures crimes that would otherwise not occur"). Second, it is outrageous misconduct when government conduct results in injuries to an innocent third party. *See United States v. Archer,* 486 F.2d 670, 677 (2d Cir. 1973) ("there is certainly a limit to allowing governmental involvement in crime. It would be unthinkable, for example, to permit government agents to instigate robberies and beatings merely to gather evidence to convict other members of a gang of hoodlums. Governmental 'investigation' involving participation in activities that result in injury to the rights of its citizens is a course that courts should be extremely reluctant to sanction. Prosecutors and their agents naturally tend to assign great weight to the societal interest in apprehending and convicting criminals; the danger is that they will assign too little to the rights of citizens to be free from government-induced criminality") (footnote omitted).

20. The government's unprecedented decision to operate a child pornography website for two weeks, exposing thousands of victims to harm that – by the DOJ's own admission – is both severe and uncontainable, warrants dismissal of the indictment.

21. Once the government seized the server hosting the Playpen site, it possessed a wealth of information it could use to criminally prosecute users without resorting to operating the site for two weeks. Even if the government wanted to deploy an NIT, it could have done so without also rendering the Playpen site functional. It could have, for example, disabled access to the images of child pornography, turned off the ability to upload pictures or videos, or even just run the site for a much shorter period of time.

22. Moreover, as noted above, the government has charged less than 1% of Playpen members, the same percentage of users it already had IP addresses for on the day it seized the site. It cannot be that the government may distribute child pornography to a thousand users for each user it catches, particularly when it already has the necessary information to identify the same number of users before it had distributes a single image.

23. "Governmental 'investigation' involving participation in activities that result in injury to the rights of its citizens is a course that courts should be extremely reluctant to sanction." *Archer,* 486 F.2d at 677. The harm to innocent third parties is especially crucial in the context of undercover child pornography investigations. Government conduct that encourages others to commit real child pornography crimes "raises very serious concerns with respect to the rights of third parties – namely, the rights of the children Congress sought to protect in enacting the prohibitions on child pornography." *United States. v. Chin,* 934 F.2d 393, 399 (2d Cir. 1991). In *Chin*, the Second Circuit warned "law enforcement

agents to think twice before engaging in investigative techniques that encourage individuals to commit actions that harm innocent third parties." *Id.* at 400.

24. The government has repeatedly emphasized in press releases how "[y]oung victims are harmed every time an image is generated, every time it is distributed, and every time it is viewed." U.S. Attorney's Office, C.D. Cal., Press Release, "Actor Named in Federal Indictment Alleging Receipt and Possession of Child Pornography on his Computer and Flash Drive" (May 27, 2016) (available at https://www.justice.gov/usao-cdca/pr/actor-named-federal-indictment-alleging-receipt-and-possession-child-pornography-his). The 2010 DOJ report to Congress added that victims ""suffer not just from the sexual abuse graphically memorialized in the images, but also from a separate victimization, knowing that the images of that abuse are accessible, usually on the Internet, and are traded by other offenders who receive sexual gratification from the children's distress." U.S. Dept. of Justice, *The National Strategy for Child Exploitation and Prevention and Interdiction: A Report to Congress* at 9 (Aug. 2010) (available at https://www.justice.gov/psc/docs/natstrategyreport.pdf)

25. Unsurprisingly, courts have embraced the DOJ's position. Images of child pornography are "a permanent record" of a child's abuse and "the harm to the child is exacerbated by their circulation." *New York v. Ferber*, 458 U.S. 747, 759 (1982). "It is common ground that the victim suffers continuing and grievous harm as a result of her knowledge that a large, indeterminate number of individuals have viewed and will in the future view images of the sexual abuse she endured. Harms of this sort are a major reason why child pornography is outlawed." *Paroline v. United States*, 572 U.S. \_, 134 S. Ct. 1710, 1726 (2014) (citations omitted). This harm is why the distribution of child pornography is

punished more harshly than the mere possession of child pornography. *Compare* 18 U.S.C. § 2252(b)(1) (minimum sentence of five years and maximum sentence of twenty years for distribution of child pornography) *with* 18 U.S.C. § 2252(b)(2) (no minimum and maximum sentence of ten or twenty years for possession of child pornography).

26. Remarkably, the government ignored these harms and distributed a huge volume of child pornography by operating the Playpen site for nearly two weeks. In essence, the government committed a more serious crime – distribution of child pornography – in order to apprehend defendants committing the less serious crime of accessing and viewing child pornography. In this way it is actually far worse than the *Archer* court's "unthinkable" scenario of "permit[ing] government agents to instigate robberies and beatings merely to gather evidence to convict other members of a gang of hoodlums." *Archer,* 486 F.2d at 677. The government will undoubtedly argue, as they always do, that the ends justified the harms. This is precisely the "course that courts should be extremely reluctant to sanction." *Id.*

27. Given the harms involved, the small number of undercover child pornography investigations approved by the courts have involved far more benign conduct than the government's conduct here. For example, in *United States v. Duncan*, 896 F.2d 271 (7th Cir. 1990) the government sent a brochure to Duncan, offering to sell child pornography. *Id.* at 272. After Duncan responded by placing an order for 48 photos, the government mailed him images from its stock of previously seized child pornography images, and then promptly arrested him ten minutes after the images were delivered. *Id.* at 274. The Seventh Circuit found no outrageousness because the third party injury was controlled, as the government only produced a small number of already seized images and

Duncan only possessed the images for minutes. *Id.* at 276-77. Similarly in *Chin*, the Second Circuit found no outrageous conduct when postal inspectors solicited defendant to order child pornography and after he responded, ultimately mailed him two magazine covers and then quickly arrested him. *Chin,* 934 F.2d at 396, 399-400.

28. The government's conduct here, however, was not isolated to a handful of images possessed momentarily. The government's operation of Playpen for two weeks resulted in an additional 9,000 images, 200 videos, and 13,000 links of child pornography being disseminated across the globe without any way to stop the further distribution of this material. The harm caused to these victims is exacerbated by the digital nature of the specific images. "Because child pornography is now traded with ease on the Internet, 'the number of still images and videos memorializing the sexual assault and other sexual exploitation of children, many very young in age, has grown exponentially.'" *Paroline,* 134 S. Ct. at 1717.

29. While law enforcement agents often use contraband, like drugs or guns, as part of undercover "buys" or to execute a sting operation, they only do so when necessary. They also make every effort to control, track and recover the contraband they are using. Here, by contrast, what the Government did is comparable to flooding a neighborhood with heroin in the hope of snaring an assortment of low-level drug users. *Compare also* U.S. Dept. of Justice, Office of the Inspector General, *A Review of the ATF's Operation Fast and Furious and Related Matters* at 419-22 ["Conclusions"] (Sept. 2012; reissued Nov. 2012) (criticizing DOJ's handling of "gun walk" investigations that resulted in the uncontrolled distribution of numerous firearms) (available at https://oig.justice.gov/reports/2012/s1209.pdf).

30. Online investigations are especially sensitive and problematic because agents have no ability to control the redistribution of pictures, malware, or other contraband once they are introduced to the Internet. As a result, the Department of Justice itself cautions its attorneys and agents about the harms that can arise from online investigations and requires special approval for operating any type of "online undercover facility." U.S. Dep't of Justice, Online Investigations Working Group, "Online Investigative Principles for Federal Law Enforcement Agents" (Nov. 1999) (available at: https://info.publicintelligence.net/DoJ-OnlineInvestigations.pdf). The Department of Justice's investigative principles emphasize that law enforcement agencies must consider several sensitive issues when determining whether to approve the establishment of an online undercover facility:

> First, online undercover facilities that offer the public access to information or computer programs that may be used for illegal or harmful purposes may have greater capacity than similar physical-world undercover entities to cause unintended harm to unknown third parties. Because digital information can be easily copied and communicated, it is difficult to control distribution in an online operation and so limit the harm that may arise from the operation.

*Id.* at 44. The statement of principles goes on to caution that the use of online undercover facilities raises complex legal and policy issues, "especially if law enforcement agents seek to use the system administrator's powers for criminal investigative purposes." These include "unique and sensitive policy issues involving privacy, international sovereignty, and unintended harm to unknown third parties." *Id*. at x. Because of these concerns, the Department of Justice requires any investigation involving an online undercover facility to undergo a special review and approval process. *Id*.

31. Department of Justice guidelines also compare online "sting" operations with other operations employing tools of criminality. Using an example of selling "cloned

phones," DOJ pointed out that agents "can prevent or minimize the potential for harm caused by their activities by, for example, arresting targets before they can use the phones or requesting the cellular carrier to block or limit access by these particular phones to the cellular network." *Id.* at 44. Even when that cannot occur, the harm is constrained by the fact that "a single 'clone phone' can only be used by one individual at a time and cannot be duplicated and redistributed to multiple users." *Id.* Similar limits, however, are difficult or impossible to impose on online undercover operations, as DOJ cautions in its policy statement:

> [T]he online facility is likely to be automated, making it difficult for the agents to limit who obtains the tools or the damage that the tools end up causing to innocent third parties. Further, unlike the clone phone, the hacker tools can be *endlessly replicated and distributed to others in a manner that law enforcement agents cannot easily control.*

*Id.* at 45 (emphasis added).

32.     Moreover, the undercover child pornography investigations approved in *Duncan* and *Chin* took place through the physical mail and before the advent of the modern Internet. They also took place before 2006 and the passage of the Adam Walsh Act. *See* Pub. L. 109-248, 120 Stat. 587 (Jul. 27, 2006). Under the Adam Walsh Act, the FBI is *prohibited* by federal law from disseminating child pornography outside of the government. For example, under the Adam Walsh Act, in a criminal case any child pornography "shall remain in the care, custody, and control of either the Government or the court." 18 U.S.C. § 3509(m); *see* Pub. L. 109–248, Title V, § 504, 120 Stat. 629, 631. Not even defense attorneys can obtain a copy of the child pornography for purposes of representing their clients. *See id.* ("[n]otwithstanding Rule 16 of the Federal Rules of Criminal Procedure, a court shall deny, in any criminal proceeding, any request by the defendant to copy,

photography, duplicate, or otherwise reproduce any property or material that constitutes child pornography… so long as the Government makes the property or material reasonably available to the defendant"). This statute has survived constitutional challenge because of the nature of child pornography, with the Seventh Circuit stating that "the assertion that § 3509(m) lacks a rational basis is unfathomable." *United States v. Shrake*, 515 F.3d 743, 745 (7th Cir. 2008) (rejecting facial constitutional challenge to § 3509(m)); *see also United States v. Wright*, 625 F.3d 583, 614-617 (9th Cir. 2010) (rejecting as applied constitutional challenge to § 3509(m)).

33. Similarly, Congress has directed the National Center for Missing and Exploited Children to alert internet providers of "hash values or other unique identifiers associated with a specific" child pornography image in order to help those providers to identify images and alert the NCMEC. 18 U.S.C. § 2258C(a)(1). But Congress prohibited the NCMEC from disclosing "actual images" of child pornography to the Internet providers for the same reason it prohibited access to defense attorneys: because "Congress is entitled to reduce the number of copies in circulation" of child pornography. *Shrake*, 515 F.3d at 746; *see also* 18 U.S.C. § 2258C(a)(3).

34. Despite its awareness of this risk, the government here allowed thousands of images to be viewed and distributed to thousands of individuals outside of the government (and outside the country) during the two weeks it ran the Playpen website, harming the victims in those images in ways that will have ramifications for a lifetime. Causing this harm to innocent third parties is outrageous government conduct. The unprecedented nature and scope of the FBI's distribution of contraband in connection with this case has no

legal justification or excuse, and offends common standards of decency.  Accordingly, the

Court can and should dismiss the indictment in this case.

  **WHEREFORE,** Steven Chase respectfully requests that this Court dismiss the instant

indictment.


       Respectfully submitted:

       <u>  s/ Peter Adolf</u>
       Peter Adolf
       Assistant Federal Defender
       North Carolina Bar No. 37157
       Attorney for Steven Chase
       Federal Defenders of Western North Carolina, Inc.
       129 West Trade Street, Suite 300
       Charlotte, NC 28202
       (704) 374-0720 (phone)
       (704) 374-0722 (fax)
       Peter_Adolf@fd.org


DATE: August 22, 2016

# CERTIFICATE OF SERVICE

I, Peter Adolf, Assistant Federal Defender, hereby certify that I have served a copy of the attached Motion to Dismiss for Outrageous Government Conduct upon the following via electronic filing:

**Cortney Randall**
U.S. Attorney's Office
       Division
227 W. Trade Street
Suite 1700
Charlotte, NC 28202
704-338-3116
704-227-0254 (fax)
cortney.randall@usdoj.gov

**Keith A. Becker**
U.S. Department of Justice, Criminal

Child Exploitation and Obscenity Section
1400 New York Ave., NW, Sixth Floor
Washington, DC 20530
          202-305-4104
Fax: 202-514-1793
Email: Keith.Becker@usdoj.gov

**Michael Wayne Grant**
United States Department of Justice
1400 New York Ave, N.W.
Sixth Floor
Washington, DC 20005
202-307-1982
Fax: 202-514-1793
Email: michael.grant@usdoj.gov

**Reginald E. Jones**
          United States Department of Justice
1400 New York Avenue NW
Washington, DC 20005
202-286-1059
          Fax: 202-514-1793
Email: reginald.jones4@usdoj.gov

Respectfully submitted:

  s/ Peter Adolf
Peter Adolf
Assistant Federal Defender
North Carolina Bar No. 37157
Attorney for Steven Chase
Federal Defenders of Western North Carolina, Inc.
129 West Trade Street, Suite 300
Charlotte, NC 28202
(704) 374-0720 (phone)
(704) 374-0722 (fax)
Peter_Adolf@fd.org

DATE: August 22, 2016